UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JON WERNER and
MICHAEL PATTON,

                Plaintiffs,                Civil Action No. 13-10287

v.                                             Honorable Victoria A. Roberts
                                              Magistrate Judge David R. Grand

HEWLETT-PACKARD COMPANY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [19]**

Before the Court is the Motion for Summary Judgment filed by Defendant Hewlett-Packard Company ("HP") on August 20, 2014. (Doc. #19). Plaintiffs Jon Werner ("Werner") and Michael Patton ("Patton") (collectively "Plaintiffs") filed a response to this motion on September 22, 2014 (Doc. #21), and HP filed a reply on October 9, 2014 (Doc. #22). The Court held a hearing on HP's motion on November 18, 2014, and the matter is now ripe for ruling.[1]

**I.    REPORT**

    **A.    Background**

        *1.    The Parties*

HP is a global technology company that provides an array of technology-related products and services, including information technology ("IT") services and enterprise software. (Doc. #19-11 at ¶3). ArcSight is an HP security software product that collects and filters data to identify potential malicious actors on a company's network. (Doc. #19-3 at 9). Werner was an HP sales representative assigned to sell ArcSight (one of HP's many software offerings). (Doc.

___

[1] An Order of Reference was entered on May 2, 2013, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. §636(b). (Doc. #10).

#21 at 7). Patton was Werner's supervisor, and he led a team of sales representatives selling ArcSight, as well as other HP software. (Doc. #19-3 at 9). Both Werner's and Patton's sales territory included Michigan and, thus, caused them to attempt to sell ArcSight to General Motors ("GM"). (*Id.*).

### 2. *The Applicable "Sales Letters"*

Both Werner and Patton were eligible for sales commission payments based on their performance throughout HP's fiscal year (November 1 to October 31). HP issued Plaintiffs "Sales Letters" that described how their 2012 sales commissions would be calculated. (Docs. #21-5, 21-6). The Sales Letters essentially provided for payment of commissions at a base rate and, subsequently, at accelerated rates if Plaintiffs met and then exceeded their assigned sales quotas. (*Id.*). Werner's 2012 quota was $3 million, and Patton's (which included Werner's) was $22,306,970. (*Id.*).

Both Sales Letters also contain language, under the heading "LEGAL INFO," that states: "HP reserves the right to adjust the terms of the Sales Plan or to cancel it at any time." (Doc. #21-5 at 3; Doc. #21-6 at 3). Elsewhere in the Sales Letters, HP reserves the right to decide any dispute related to "the terms of th[e] letter and applicable policies and guidelines" "in its sole discretion". (*Id.*).

In addition, Plaintiffs' Sales Letters expressly incorporate, through an electronic link, HP's Global Sales Compensation Policy, which provides as follows, in relevant part:

> HP reserves the right to adjust or cancel the terms of the Sales plans, or Sales letters with or without notice at any time, including but not limited to adjusting accounts, goals/quota, target incentive amount (TIA) or to address changing or unforeseen business conditions or to correct administrative errors. HP also reserves the right to change or discontinue this Policy, with or without notice, at any time.

(Doc. #19-5 at 13).

HP's Global Sales Compensation Policy also includes a Management Incentive Performance Review ("MIPR") policy, the purpose of which is to "evaluate Sales employee performance significantly above quota or for the evaluation of credit for 'large' deals." (Doc. #19-5 at 29). Specifically, the MIPR provides in relevant part:

> [A] management review may occur for large transactions, including groups of related transactions. The Sales employee should have no expectation of receiving incentive payments in connection with these large transactions where the credit is disproportionate to the employee's assigned quota or to the employee's contribution toward the sales transactions, as determined in the sole discretion of HP.

(*Id.*). The "Terms and Conditions" sections of Plaintiffs' Sales Letters similarly state that "HP reserves the right to review and in its sole discretion adjust incentive payments associated with large transactions for which the incentive payments are disproportionate when compared with the employee's assigned quota or contribution toward the transactions." (Doc. #19-2 at 39; Doc. #19-3 at 25).

### 3. The GM Enterprise-Wide Software Licensing Agreement ("GM ELA")

There is no dispute that Werner began calling on GM in 2010 in an attempt to sell ArcSight to that company. According to Plaintiffs, in October 2011, Werner provided a Proof of Concept demonstration for GM's manufacturing division, during which he demonstrated the capabilities of ArcSight software for use in GM's plants. (Doc. #21 at 10). In addition, Plaintiffs claim that from late 2011 through the spring of 2012, Werner also was involved in developing a sale of ArcSight software to GM for a Security Operations Center that it was planning. (*Id.* at 10-12). Werner forecast this deal as having potential revenue of between $3,000,000 and $5,000,000.[2] (Doc. #19-2 at 49).

---

[2] Werner asserts that he believed the potential value of this ArcSight software sale was actually "[b]etween 10 and $15 million." (Doc. #21-7 at 3). He claims, however, that he was instructed by his managers to "put something conservative" into his sales forecast about this expected sale.

During this same timeframe, however, separate momentous discussions were taking place at the executive levels of GM and HP.  Historically, GM had had a contractual relationship with Electronic Data Systems Corporation ("EDS") to perform a wide array of services to address GM's IT needs.  (Doc. #19-10 at ¶4).  After HP's acquisition of EDS in 2009, HP continued to provide those IT services to GM.  (*Id.*).

Randy Mott ("Mott") was HP's Chief Information Officer ("CIO") until he left this position to become GM's CIO in February 2012.  (Doc. #19-11 at ¶5).  At a meeting with HP's senior executives on March 26, 2012, Mott announced that GM planned to immediately terminate its longstanding IT outsourcing contract with HP.  (Doc. #19-10 at ¶¶4-6; Doc. #19-5 at ¶¶3-5).  In that same meeting, Mott announced that, as part of its insourcing strategy, it wanted to buy HP's entire menu of software products.  (Doc. #19-10 at ¶5; Doc. #19-5 at ¶5).  Mott proposed a five-year, unlimited enterprise-wide licensing agreement, which would allow GM to use as much of HP's software as it liked, anywhere in the company.  (Doc. #19-10 at ¶5; Doc. #19-5 at ¶5).  After learning of the ELA possibility from Mott, HP instructed all of its individual software sales representatives, including Werner, to "stand down" (i.e., to stop their individual sales efforts at GM) so as not to interfere with the high-level ELA negotiations.  (Doc. #19-2 at 18; Doc. #19-5 at ¶7).

HP subsequently formed a team of senior executives to negotiate what would become one of the largest software sales in its history.  (Doc. #19-5 at ¶¶6-8; Doc. #19-9 at ¶¶3, 5).  It is undisputed that neither Werner nor Patton was a part of the ELA negotiation team, and neither has even met Mott, GM's decision-maker.[3]  (Doc. #19-2 at 13, 17; Doc. #19-3 at 19, 20).

---

(*Id.*).  Even assuming this is true, such a fact is irrelevant to this Court's analysis of the enforceability of the alleged contracts at issue.

[3] In their response to HP's motion, Plaintiffs assert that they played "a key role regarding the

4

Ultimately, in October 2012, HP entered into an approximately $95 million ELA with GM, part of which included $10.5 million for ArcSight licenses. (Doc. #19-9 at ¶¶5, 7).

### 4. The Commissions Paid to Werner and Patton

After the GM deal closed, because it was a large transaction,[4] a decision was made to apply HP's MIPR policy to determine the sales commissions for the hundreds of HP sales representatives who had GM in their territories. Accordingly, on November 2, 2012, Hans-Peter Klaey, HP's global field sales leader, notified HP's sales force via email as follows:

> GM's business decision was unexpected and occurred after the annual account planning and quota deployment lockdown date. As a result, although the strategic shift in GM's model resulted in a significant benefit to HP Software overall, HP Software was not able to deploy quota for this FY12 year-end large transaction.
>
> HP Software is fully committed to rewarding our Sales employees for the business they generate through customer engagement and activities. A management incentive performance review (MIPR) is being conducted for this transaction to determine the appropriate manner of handling this large transaction. As part of its evaluation, HP Software must determine the appropriate revenue recognition.
>
> For those employees who have made an extensive contribution to the deal, a separate communication will be sent by mid-November, after all internal and external reviews have been concluded, for the large transaction payment criteria and details. Obviously, in making its determinations, HP will adhere to the policy that incentive payments will not be provided in connection with large transactions where the credit is disproportionate to an employee's assigned quota or to an employee's contribution toward the sales transaction.

(Doc. #21-12 at 2).

Ultimately, HP made the decision to compensate its sales representatives for the GM

---

ArcSight portion of the potential ELA deal." (Doc. #21 at 13). This assertion, however, is not borne out by the record evidence. Regardless, because the Court finds that Plaintiffs' Sales Letters do not constitute enforceable contracts, *see infra* at 7-12, it is irrelevant whether – or to what extent – Plaintiffs participated in the ELA negotiations.

[4] Plaintiffs do not dispute that this was a "large transaction" as that term is used in the various policies and documents discussed above. (Doc. #19-2 at 11-12; Doc. #19-3 at 18).

ELA deal, but not to pay accelerated commission rates for the total revenue for the deal. (Doc. #19-5 at ¶16). Specifically, HP determined that sales representatives would be given full credit for the portion of the GM ELA revenue that management determined was reasonably likely to occur in 2012 in the absence of the GM ELA. (*Id.*). In the case of ArcSight, that credit was $4 million (out of the $10.5 million sale). (*Id.* at ¶17). The additional revenue from the GM ELA would be paid at base commission rates. (*Id.* at ¶16). HP communicated this approach to the sales field on November 27, 2012. (Doc. #19-2 at 62-63).

For Werner, this resulted in 2012 commission payments of approximately $692,163.44, most of which was attributable to the GM ELA. (Doc. #19-8 at ¶14). Patton's 2012 sales commissions amounted to approximately $155,615.96, about one-third of which was from the ELA. (*Id.* at ¶15). After contesting HP's decision – arguing that they should have been paid at their accelerated commission rates – and being told that it would not change, Plaintiffs resigned and brought suit, collectively seeking in excess of $1 million in additional sales commissions. (Doc. #1 at ¶¶11, 16).

     **B.**    **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo*

*v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

**C.    Analysis**

Plaintiffs' only claims in this case are for breach of contract. HP argues that summary judgment is appropriate on these claims because, as a matter of law, the Sales Letters are not enforceable contracts. (Doc. #19 at 24-29). Alternatively, HP argues that even if the Sales Letters are contracts, they give HP the sole discretion to determine the amount of Plaintiffs' commissions and because HP exercised that discretion in good faith, there was no breach. (*Id.* at 29-36).

   *1.    The Applicable Law*

Under Michigan law[5], the essential elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract, (3) that the defendant

---

[5] The parties agree that Michigan law governs Plaintiff's breach of contract claims.

7

breached the contract, and (4) that the breach caused the plaintiff injury.  *See Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 777 (E.D. Mich. 2001).  "The party seeking to enforce a contract has the burden of showing that it exists."  *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411, 417 (6th Cir. 2011).  "[A] basic requirement of contract formation is that the parties mutually assent to be bound."  *Smith v. Chrysler Fin. Corp.*, 101 F. Supp. 2d 534, 539 (E.D. Mich. 2000) (quoting *Rood v. General Dynamics Corp.*, 444 Mich. 107, 118 (1993)).  Another "essential element in a contract claim is legal consideration."  *46th Circuit Trial Court v. Crawford Cnty.*, 476 Mich. 131, 158 (2006).  HP argues that because Plaintiffs cannot establish a mutual intent to be bound, or the existence of valid legal consideration, the Sales Letters are not enforceable contracts.  The Court agrees.

### 2.  *HP Expressly Manifested an Intent Not to Be Bound*

HP first argues that no enforceable contract exists because the plain language of the Sales Letters demonstrates that it did not manifest an intent to be bound.  (Doc. #19 at 25-27).  Here, as set forth above, Plaintiffs' Sales Letters unequivocally state that HP may "adjust the terms of the Sales Plan or cancel it at any time."  (Doc. #19-2 at 38-39; Doc. #19-3 at 24-25).  HP's Global Sales Compensation Policy, which was electronically incorporated into Plaintiffs' Sales Letters, contains even more expansive language confirming HP's right to "adjust or cancel the terms of Sales plans, or Sales letters with or without notice at any time" and to "change or discontinue [the compensation] Policy, with or without notice, at any time."  (Doc. #19-5 at 13).

"As a general contract principle, 'mutuality of obligation' means that both parties to an agreement are bound or neither is bound, that is, mutuality is not present where one party is bound to perform, but not the other."  *Smith*, 101 F. Supp. 2d at 538 (internal quotations omitted).  As HP points out, Michigan courts have held that this necessary element is not present

8

when an employment policy "may be unilaterally changed by the employer at any time in the employer's sole discretion." *Id.; see also Stewart v. Fairlane Cmty. Mental Health Ctr.*, 225 Mich. App. 410, 420 (1997) ("We cannot conclude that an agreement or provision is mutual or binding where … an employer may unilaterally amend at any time every policy contained in its employee manual.").[6] In this case, where HP specifically reserved the right to unilaterally change or cancel the terms of Plaintiff's Sales Letters – as well as the Global Sales Compensation Policy itself – there is simply no indication of an intent to be bound on the part of HP.

Moreover, HP has cited numerous cases in which courts have held, as a matter of law, that a bonus or compensation plan does not create an enforceable contract if the language of the plan specifically provides that the employer reserves the right to modify or terminate the plan at any time. (Doc. #19 at 26-27). For example, in *Geras v. Int'l Bus. Mach. Corp.*, 638 F.3d 1311, 1316-17 (10th Cir. 2011), the Tenth Circuit rejected a salesperson's breach of contract claim for unpaid sales commissions because, though the applicable sales letter set forth IBM's policies and the formula for paying the plaintiff's sales commission, it "reiterated that IBM retained the discretion to alter or cancel those policies, even after sales had occurred." *See also Kavitz v. Int'l Bus. Mach. Corp.*, 458 F. App'x 18, 20 (2d Cir. 2012) ("Even if we had any doubt on this point

---

[6] Plaintiffs attempt to distinguish *Smith* and *Stewart* on the basis that they were both cases in which an employer sought to impose a mandatory arbitration provision on at-will employees through non-binding employment policies. (Doc. #21 at 28). According to Plaintiffs, in those cases, the employees "were being asked to give up certain rights without getting anything in return," whereas here, Plaintiffs "are not requesting HP to give up something in exchange for nothing." (*Id.*). This is a distinction without a difference. In *Smith*, the court specifically held that a policy reserving "the right to amend, modify, suspend, or terminate all or part of [the policy] at any time in [the employer's] sole discretion" is not an enforceable contract under Michigan law. *Smith*, 101 F. Supp. 2d at 538. Here, where Plaintiffs concede that the policies at issue in *Smith* and *Stewart* gave the employers the same broad discretion that HP expressly reserved in their Sales Letters, there is no basis on which to conclude that their holdings would be inapplicable. (Doc. #21 at 28).

(and we do not), that IBM retained unfettered discretion under the Plan to adjust its terms or even to cancel the Plan entirely confirms that the document is not an enforceable contract."); *Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1237 (N.D. Ill. 1996) (finding that an executive compensation plan did not create an enforceable contract as a matter of law because it did not contain a clear right to bonus commissions since "[d]efendant clearly retained the right to modify or cancel the plan at any time without prior notice. Such a statement is an effective disclaimer to negate any possible promissory intent."); *Bahr v. Technical Consumer Products, Inc.*, 2014 WL 1094426, at *8 (N.D. Ohio Mar. 17, 2014) ("Cases from [various] jurisdictions generally reinforce the conclusion that contract formation does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission.")).

The most recent and analogous case law also favors HP's position. Just recently, the Western District of Pennsylvania considered a virtually identical breach of contract claim, arising out of commissions sought by another former HP sales representative in the wake of the GM ELA. *See Barton v. Hewlett-Packard Co.*, 2014 WL 6966986 (W.D. Pa. Dec. 9, 2014). In *Barton*, the court was tasked with interpreting the same language at issue in this case to determine whether the plaintiff's Sales Letter constituted an enforceable contract. *Id.* at *4-7. Applying Pennsylvania law, which is similar to Michigan law in all relevant respects, the *Barton* court concluded that because HP retained the unfettered discretion to cancel or modify the plaintiff's Sales Letter at any time, with or without notice, there was no enforceable contract. *Id.* Consequently, the *Barton* court granted summary judgment in favor of HP on the plaintiff's breach of contract claim. This Court finds *Barton's* analysis persuasive.

In the face of the significant body of case law cited by HP, Plaintiffs rely almost exclusively on *Holland v. Earl G. Graves Publishing Co., Inc.*, 46 F. Supp. 2d 681 (E.D. Mich.

10

1998), for the proposition that their Sales Letters "were offers for a unilateral contract" and, consequently, that HP was "not free to unilaterally modify or amend the incentive plan after [Plaintiffs] began substantially performing."[7] (Doc. #21 at 25-28). In *Holland*, the plaintiff, a sales representative for Earl G. Graves Publishing Company ("Graves"), had a compensation plan that included an assigned quota and provided for incentive pay to be earned at an increasing rate as her sales met and then exceeded her assigned quota. *Id.* at 682. Holland substantially exceeded her quota during the fiscal year at issue, but, after the fiscal year was completed, Graves retroactively increased her quota, which had the effect of reducing her incentive compensation. *Id.* at 684. Holland sued Graves, alleging breach of a unilateral contract.

In ruling on Holland's motion for summary judgment, the court recognized that, "The formation of a unilateral contract typically involves a case in which an offer is made by a party which invites acceptance by performance rather than by a promise to perform." *Id.* at 685 (citing *Restatement (Second) of Contracts,* §45, cmt. A (1979)). The court further noted that, "Once an offer for a unilateral contract is made, and part of the requested performance has been rendered by the offeree, the offer cannot be unilaterally revoked or modified." *Id.* In that case, the court found that Graves' compensation plan was a unilateral contract that it was not free to amend or modify after Holland began substantially performing. *Id.* at 687.

Comparing the language contained in Holland's compensation plan with that contained in Plaintiffs' Sales Letters, however, it is clear that *Holland* does not apply. In *Holland*, Graves' compensation plan <u>did not</u> include language reserving the right to modify or amend the plaintiff's quota; here, however, HP <u>did</u> expressly reserve the right to modify (or cancel) the

---

[7] Plaintiffs also seek to distinguish the cases relied on by HP on the basis that "they are not based on Michigan law." (Doc. #21 at 28-29). As HP correctly points out in its reply brief, however, Michigan law on this issue does not materially differ from the law of other states.

11

Sales Letters at any time, with or without notice. Thus, *Holland* is inapposite. Indeed, in a footnote, the *Holland* court suggested that it would have reached a different result if Graves had in fact reserved the right to modify the plaintiff's sales quota, meaning that, if anything, *Holland* supports HP's argument. *Id.* at 688, n. 10.

In short, because no material question of fact exists that Plaintiffs' Sales Letters are not enforceable contracts,[8] HP is entitled to summary judgment on Plaintiffs' breach of contract claims. In light of this conclusion, the Court need not address Plaintiffs' argument that HP breached those alleged contracts when it refused to pay Plaintiffs the accelerated commission rates.

## II. RECOMMENDATION

For the reasons set forth above, **IT IS RECOMMENDED** that HP's Motion for Summary Judgment (**Doc. #19**) be **GRANTED**, and that Plaintiffs' action be **DISMISSED**.

Dated: December 29, 2014                      s/ David R. Grand
                                              DAVID R. GRAND
                                              UNITED STATES MAGISTRATE JUDGE

---

[8] Additionally, in order to establish the existence of an enforceable contract, Plaintiffs must show that their alleged contracts with HP are supported by valid consideration. *See Frazier Indus., L.L.C. v. Gen. Fasteners Co.*, 137 F. App'x 723, 731 (6th Cir. 2005) ("regardless of whether an agreement is bilateral or unilateral, there must be valid legal consideration for a contract to result"). An illusory promise does not suffice. *See id.* Here, where HP expressly reserved the right to change or cancel the terms of the Sales Letters or compensation policy at any time, its promise to pay commissions was illusory. *See, e.g., Meyer v. AmerisourceBergen Drug Corp.*, 264 F. App'x 470, 476 (6th Cir. 2008) (plan that provided company with "unfettered discretion regarding whether or not to award" employee a bonus was illusory); *Day v. Fortune Hi-Tech Mktg., Inc.*, 536 F. App'x 600, 604 (6th Cir. 2013) ("[I]n this case, in effect, [the employer] promised to do certain things unless it decided not to, and that is by definition illusory."). Thus, the alleged contracts lack consideration and are unenforceable for this reason, too.

12

## **NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 29, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
